# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ANGELA M. WEBER**
    **Plaintiff,**

    v.                                                Case No. 09-C-0912

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
    **Defendant.**

## DECISION AND ORDER

The Social Security Administration ("SSA") awards supplemental security income ("SSI") benefits to children deemed "disabled" under a three-step test. If (1) the child is not employed (not engaged in "substantial gainful activity" in SSA parlance) and (2) suffers from a "severe impairment" that (3) meets, equals or functionally equals an impairment contained in the "Listings," a compilation of presumptively disabling conditions found in the agency's regulations, she is granted benefits. See 20 C.F.R. § 416.924.

Each Listing contains specific "criteria," all of which must be satisfied before the child-claimant will be found to meet or equal that Listing. See Baker ex rel. Baker v. Barnhart, 410 F. Supp. 2d 757, 760 (E.D. Wis. 2005) (citing Keys v. Barnhart, 347 F.3d 990, 992 (7th Cir. 2003); Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999)). If the claimant does not meet or equal a Listing, she may nevertheless obtain benefits by showing "functional equivalence," which is determined by evaluating her degree of limitation – "extreme," "marked," "less than marked," or no limitation – in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and

manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). If the claimant has "marked" limitations in two domains or an "extreme" limitation in one, she is deemed disabled. § 416.926a(a).

In the present case, plaintiff Angela Weber – now an adult, but age fourteen when her father filed an SSI application on her behalf – alleged disability based on developmental delays, speech and language problems, learning disabilities, high blood pressure and asthma. (Tr. at 85; 105.) In various reports, plaintiff's father noted her immaturity, inappropriate behavior, bed-wetting (enuresis), poor hygiene and – at about five feet tall and 220 to 240 pounds – her obesity. (Tr. at 88-125.) The SSA also collected school records, which recorded "very serious problems" in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others; and "serious problems" in the domain of caring for oneself. (Tr. at 135-40.) The school records further indicated that plaintiff's academic performance was significantly below her grade level (Tr. at 177; 327; 348; 377), that she required special education instruction (Tr. at 70-72; 188; 343; 352), and that her misbehavior resulted in suspensions (Tr. at 126; 380).

The SSA nevertheless denied the application initially (Tr. at 52; 81) and on reconsideration (Tr. at 50; 75), so plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. at 30-32). Applying the three-step test, the ALJ found that plaintiff had never engaged in substantial gainful activity, and that she suffered from the severe impairments of borderline intellectual functioning and learning disabilities. The ALJ noted plaintiff's obesity, asthma and hypertension, but found that these conditions did not significantly affect her functioning. (Tr. at 22.) Plaintiff argued at step three that she met the Listing for mental retardation, but the ALJ, relying on the testimony of a medical expert he summoned to the

2

hearing, rejected the claim. The ALJ then determined that although plaintiff had a marked limitation in the domain of acquiring and using information, she had less than marked or no limitation in the other domains. He therefore denied the application. (Tr. at 22-29). The Appeals Council declined plaintiff's request for review (Tr. at 13), making the ALJ's decision the agency's final word on plaintiff's application. See Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Plaintiff now seeks judicial review of the decision, arguing that the ALJ erred in considering her claim under the Listings and in evaluating the credibility of her and her father's testimony and written submissions.

**I.**

Judicial review of an ALJ's decision is limited to determining whether it is supported by "substantial evidence" and free of harmful legal error. Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Because substantial evidence simply means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009) (internal quote marks omitted), if the evidence of record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld, Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The reviewing court does not re-weigh the evidence, resolve evidentiary conflicts, decide questions of credibility, or substitute its judgment for the ALJ's. Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000).

Judicial review is, accordingly, deferential. But it is "not abject." Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). The court cannot uphold a decision which lacks meaningful analysis of the evidence and the testimony, see, e.g., Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005), or which, because of internal contradictions or missing premises,

3

fails to build a logical bridge between the facts of the case and the outcome, Parker, 597 F.3d at 921. Because the ALJ's decision in the present case ran afoul of these requirements, I must reverse and remand for further proceedings.

## II.

Under Listing 112.05(D), "Mental Retardation," a child-claimant is deemed disabled if she demonstrates "significantly subaverage general intellectual functioning with deficits in adaptive functioning," along with a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." See Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 568 (7th Cir. 2003).[1] In the present case, an SSA consultant, Dr. Phillip Ruppert, administered the Wechsler Intelligence Scale for Children – Third Edition ("WISC-III"), under which plaintiff obtained a verbal IQ score of 78, performance IQ of 62, and full scale IQ of 68. (Tr. at 286.) Although plaintiff's score on the verbal measure reflected "borderline intelligence" rather than mental retardation, see Mendez v. Barnhart, 439 F.3d 360, 361 (7th Cir. 2006), in cases where the WISC-III is administered the SSA uses the lowest figure under Listing 112.05, see 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.00D9. Therefore, if plaintiff has some other severe impairment, and if the performance or full scale IQ scores below 70 are valid, she would meet Listing 112.05(D).

The ALJ concluded that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (Tr. at 22.) However, he failed to explain whether the claim failed because she lacked the other severe impairment required or because the IQ scores below 70 were invalid, stating only that: "The

---

[1]Adult Listing 12.05(C) tracks childhood Listing 112.05(D). See Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003).

4

medical expert, Dr. Donald Feinsilver, testified that the claimant's impairments do not cause her to meet or equal any of the listings."[2] (Tr. at 22.) Later, in the section of his decision discussing functional equivalence, the ALJ wrote that Dr. Feinsilver testified that plaintiff lacked the additional severe impairment needed to meet Listing 112.05. (Tr. at 24.) But Dr. Feinsilver's testimony on the matter was somewhat muddled and, in any event, the ALJ's own step-two determination refutes a finding that the Listing claim failed for lack of an additional severe impairment.

At the outset of Dr. Feinsilver's testimony, the ALJ stated that "I have obesity as a severe impairment,"[3] but that plaintiff's asthma and hypertension seemed "controlled" with medication. (Tr. at 449.) Dr. Feinsilver then evaluated plaintiff under adult listing 12.05, relying primarily on Dr. Ruppert's report and IQ scores. (Tr. at 449-51.) In his report, Dr. Ruppert had opined that plaintiff likely functioned at a somewhat higher level than her scores indicated (Tr. at 286), but Dr. Feinsilver stated that he did not "have quite so many qualms about calling these potentially accurate WISC scores, 78, 62, 68 full scale" (Tr. at 454), and that if he had written the report he would not have added an opinion that the scores were actually higher (Tr. at 470). The ALJ then again stated that plaintiff's asthma and high blood pressure were controlled, and that "I would lean that those are not posing severe impairments on her." (Tr. at 455.) Dr. Feinsilver seemed to agree, stating that those conditions did not appear to alter

---

[2]The ALJ at no point suggested that plaintiff failed to meet the criteria in the introductory paragraph of the Listing, i.e. deficits in adaptive functioning. See Mayes v. Astrue, No. 1:07-cv-0193, 2008 WL 126691, at *5 (S.D. Ind. Jan. 10, 2008) (explaining that the claimant must satisfy the introductory paragraph, as well as the IQ score/other impairment criteria).

[3]Despite making this statement at the hearing, in his decision the ALJ found plaintiff's obesity non-severe. (Tr. at 22.)

5

plaintiff's daily activities. (Tr. at 455.) Dr. Feinsilver seemed uncertain of the cause of plaintiff's enuresis, but stated: "I would wonder whether that's really going to have much impact in work capabilities one-way or the other." (Tr. at 456.) The ALJ then stated that "we don't have another significant mental or physical," and Dr. Feinsilver agreed that "she's going to be a technical miss if we look at the adult listings." (Tr. at 456-57.) Dr. Feinsilver then attempted to turn to the domains, but the ALJ indicated that he first had to determine whether plaintiff met or equaled a listing. He asked, "do I have an understanding you don't believe, in your medical opinion that the listings are either met or equaled on the evidence in the file?" Dr. Feinsilver said, "That's right. I think she is a miss although I think . . . there is grounds for concern." (Tr. at 459.)

Thus, although Dr. Feinsilver eventually agreed with the ALJ's suggestion that plaintiff lacked the other required impairment, it is difficult to read his testimony as affirmatively supporting the ALJ's conclusion as opposed to merely acquiescing to it.[4] In any event, the ALJ himself negated any conclusion that plaintiff's Listing claim failed due to the absence of another impairment. The ALJ specifically found that plaintiff had two severe impairments, borderline intellectual functioning and learning disabilities. (Tr. at 22.) Although in some cases a claimant's difficulty learning may simply be a manifestation of her intellectual limitations, the case-law makes clear that a "learning disability" can be an impairment separate and distinct from the claimant's borderline intellectual functioning or mental retardation. E.g., Williams v. Astrue, No. 07 Civ 4134, 2008 WL 4755348, at *10-11 (S.D.N.Y. Oct. 27, 2008); Brown ex rel. Brown v. Commissioner of Social Sec., 311 F. Supp. 2d 1151, 1161 (D. Kan. 2004) (citing Hall

---

[4] I also note that Dr. Feinsilver, a psychiatrist, may lack the expertise to opine on plaintiff's alleged physical impairments.

6

v. Apfel, 122 F. Supp. 2d 959, 967 (N.D. Ill. 2000); Lugo v. Barnhart, No. 02 c 50361, 2003 WL 22025011, at *9 (N.D. Ill. Aug. 28, 2003)); see also SSR 09-2p n.11; Elster v. Barnhart, No. 01 C 4085, 2003 WL 124432, at *5 (N.D. Ill. Jan. 13, 2003). By listing the impairments separately, the ALJ here seemed to view them as distinct. Therefore, plaintiff would satisfy this portion of the Listing.

As alluded to above, Dr. Ruppert's report contains some support for the notion that the IQ scores represent "just a slight under estimate of [plaintiff's] true level of cognitive functioning." (Tr. at 286.) As the ALJ noted, Dr. Ruppert believed that plaintiff likely fell in the lower limits of the borderline range of intelligence. (Tr. at 23; 287.) And by labeling plaintiff's first severe impairment as "borderline intellectual functioning," the ALJ may have signaled his agreement with that conclusion. (Tr. at 22.) The problem with this supposition is that Dr. Feinsilver, whose testimony the ALJ positively credited, stated that he was comfortable with the scores as written and that, had he written the report, he would not have suggested that the true scores were higher. (Tr. at 470.) The ALJ failed to resolve this conflict. See Robinson v. Astrue, 667 F. Supp. 2d 834, 845-46 (N.D. Ill. 2009) (remanding where the ALJ failed to resolve a conflict between two doctors as to the applicability of Listing 12.05); see also Vander Linden v. Astrue, No. 09-C-534, 2010 WL 1417931, at *6 (E.D. Wis. Apr. 7, 2010) (Griesbach, J.) (citing Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999); Strunk v. Heckler, 732 F.2d 1357, 1360 (7th Cir. 1984)) (stating that while the ALJ need not automatically find mental retardation based on an IQ score, he must provide some explanation for finding the scores invalid).

It is particularly important that the ALJ address the issue in this case, given plaintiff's operative IQ score of 62. While it is true that IQ is more accurately seen as a range rather than a fixed point, it is difficult to see how plaintiff's score actually exceeds 70. According to the

7

literature, one "standard error of measurement" ("SEM"), which results in the addition or subtraction of 3 or 4 IQ points, produces a 66% probability of accuracy, while two SEMs creates a 95% probability of accuracy. In this case, then, there is a 95% probability that plaintiff's lowest IQ score is between 54 and 70, all within the mental retardation range. See Thomas v. Allen, 614 F. Supp. 2d 1257, 1271 (N.D. Ala. 2009).

For these reasons, the matter must be remanded so the ALJ can reevaluate plaintiff's claim under the Listings. See Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir.2006) ("[A]n ALJ should mention the specific listings he is considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a remand") (quoting Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004)).

### III.

The ALJ will also have to reconsider the credibility of plaintiff and her father's testimony and written submissions. SSR 96-7p instructs ALJs to follow a two-step process in evaluating the credibility of a claimant's contentions. First, the ALJ must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms alleged. If not, the alleged symptoms cannot be found to affect her ability to function. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit her ability to function. SSR 96-7p. In making this determination, the ALJ must consider the entire record and provide specific reasons for his resulting credibility determination, grounded in the evidence and articulated in the decision. See Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).

Here, after providing a one paragraph summary of the testimony, the ALJ wrote:

8

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons stated below.

(Tr. at 23.) The ALJ then evaluated the six domains, but he provided no further reasons for his credibility determination. (Tr. at 23-28.)

Not only did the ALJ fail to provide the specific reasons SSR 96-7p requires, his conclusion effectively turned "the credibility determination process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [witnesses'] credibility as an initial matter in order to come to a decision on the merits." Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 788 (7th Cir. 2003). Further, a statement that testimony is not credible to the extent that it varies from the ALJ's ultimate conclusion "yields no clue to what weight the trier of fact gave the testimony." Parker, 597 F.3d at 922. Finally, I am troubled by the ALJ's reluctance to allow plaintiff's father to testify. Although he eventually relented, he argued with plaintiff's counsel over the issue for several pages of transcript, suggesting that the testimony would be redundant and tainted by "secondary gain opportunity." (Tr. at 389-90.) The ALJ then devoted just one sentence of his decision to the father's testimony and said nothing at all about the many reports he filled out. While it is true that the ALJ need not discuss every piece of evidence in the record, he may not ignore an entire line of evidence that is contrary to the ruling. Terry, 580 F.3d at 477.

These errors are not harmless. See Keys, 347 F.3d at 994 (holding that the doctrine of harmless error is fully applicable to judicial review of administrative decisions). To note but one example of where the testimony could have made a difference: despite stating at the hearing

9

that he considered plaintiff's obesity severe, in his decision the ALJ found it non-severe. Had he considered plaintiff's testimony that she became winded simply walking around the mall (Tr. at 411) – a problem also noted by her father in a written report (Tr. at 118), he may have come to a different conclusion. I also note that the ALJ failed to consider many of the school records in the file, including a questionnaire completed by one of plaintiff's teachers, in which she opined that plaintiff had a "very serious problem" in numerous areas under the second and third domains (Tr. at 136-37) and a "serious problem" in several areas under the fifth domain (Tr. at 139). See Salaam ex rel. S.S. v. Astrue, No. 08-C-0238, 2008 WL 4238958, at *5 (E.D. Wis. Sept. 15, 2008) (discussing the importance of teacher questionnaires in evaluating the domains, and collecting cases). Had the ALJ considered this document and changed his mind in just one of these domains, the result of the case would have been different.

**IV.**

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.[5]

Dated at Milwaukee, Wisconsin this 11th day of May, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

---

[5]Plaintiff asks for a judicial award, but that is appropriate only when all material factual issues have been resolved and the record clearly supports a finding of disability. As discussed above, issues remain for the ALJ's resolution on remand. Therefore, the remedy is remand. See Neave v. Astrue, 507 F. Supp. 2d 948, 966-67 (E.D. Wis. 2007).